IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| NICOLE WOODS,<br>    Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,<br>    Defendant. | Case No. 4:15-CV-04210-JEH |

## Order and Opinion[1]

### I

This is an action for judicial review of the final decision of the Defendant, Carolyn Colvin, Acting Commissioner of Social Security (Commissioner), denying Jeromy Woods's application for Disability Insurance Benefits under Title II of the Social Security Act. Woods died in December 2014 and Nicole Woods, his wife at the time of his death, is now the Plaintiff.[2]

Woods requested a hearing before an administrative law judge (ALJ) after the state agency denied his application. The ALJ held a hearing in July 2014; Woods, who was represented by counsel, and an impartial vocational expert (VE) testified. The following month, the ALJ found Woods not disabled at step five of the sequential evaluation process. At steps two and three, the ALJ determined that Woods's combined impairments were severe but did not meet or medically equal

---

[1] Citations to the Docket in this Court are abbreviated as "D. ___." Citations to the Social Security Transcript are cited as "Tr. ___."
[2] On Christmas Eve, 2014, Woods killed his girlfriend, Cortney Huffman, and then killed himself. *See* D. 23 at p. 8 n. 5.

1

the severity of a listed impairment. Woods retained the residual functional capacity (RFC) to perform light work with nonexertional limitations. At step four, the ALJ determined that Woods could no longer perform any past relevant work. The ALJ found Woods not disabled at step five because a person with his age, education, and RFC could perform other work in the national economy.

In October 2015, the Appeals Council denied Woods's request for review, making the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.955, 404.981. The Plaintiff then filed suit under 42 U.S.C. § 405(g).[3] The Plaintiff having filed her Motion for Summary Judgment (D. 21) and the Commissioner having filed her Motion for Summary Affirmance (D. 22), this matter is now ripe for a ruling. For the reasons stated, *infra*, the Plaintiff's Motion for Summary Judgment is DENIED and the Commissioner's Motion for Summary Affirmance is GRANTED.

## II
## A

Jeremey Woods was 37 years old at the time of his hearing before the ALJ held on July 17, 2014. He completed the 12th grade and worked as a self-taught electrician until 2008 when tragedy struck. In early April of that year, Woods was a passenger in a utility truck when it collided with another vehicle head-on at 65 miles per hour. He suffered multiple injuries in the accident, including a large laceration to his head, a closed head injury, a compression fracture of his L1 and L2 vertebrae, and a fracture of his right leg at the tibia and fibula. He spent two weeks in the hospital, during which time he underwent surgery to repair his leg fracture. He also received extensive post-operative care after his release from the hospital.

---

[3] The parties consented to the jurisdiction of a U.S. Magistrate Judge. (D. 18-20).

In May of 2008, Woods began treatment with a spine specialist due to his report of ongoing back pain. X-rays taken at the time demonstrated residual fractures of the left transverse process at L2, L3, and L4 and of the right transverse process at L1, L4, and L4. The vertebral height on the left side of the L1 vertebral body exhibited a loss of 40%, and the L4 vertebra had a horizontal fracture through the mid body. Treatment was initially deferred in favor of observation to allow for the possibility of a spontaneous fusion, but when no change was apparent in September of 2008, physical therapy and pain medication was recommended. After Woods returned to work that month, he reported a significant increase in his pain.

With ongoing pain, persistent disc space, and the L1 compression fracture with residual deformity and angulation present, Woods underwent a thoracolumbar discectomy at T12-L1 with an interbody fusion and hardware implantation. The radiographs from May and June 2009 showed a stable fusion at the affected level of the spine without complications with no other acute osseous pathology identified. Indeed, on May 28, 2009, Woods reported feeling much better regarding his back pain and his implanted hardware was noted to be stable. On June 11, 2009, he was still doing well with no significant pain, and, consequently, was released to fully duty without restriction.

The record is devoid of any medical treatment for the next fifteen months until, on October 5, 2010, when he presented to "establish care and to get help for smoking." (Tr. 604).  At the time, Woods took 10 milligrams of Flexeril, a muscle relaxant, three times daily. *Id*. He reported only some neck pain due related to moving a box.

Seven months later, Woods applied for disability benefits on April 3, 2012. But for the treatment note of October 5, 2010, the record is devoid of any medical treatment for his claimed physical ailments from June 11, 2009, until April, 2012—

3

a period of 22 months. After Woods applied for disability benefits, he presented to Kreg J. Love, D.O., on April 10, 2012, complaining of "Low back pain, worse over the last 4 months. Has what feels like a constant pressure over his shoulders." (Tr. 601). At this visit, he reported his lower back pain as getting progressively worse. *Id.* The doctor started Woods on methadone for pain and noted he would recheck MRIs of both the cervical and lumbar spine.

On April 19, 2012, at Woods's next doctor visit, the treatment notes indicate the MRI of the cervical spine was "essentially normal," notwithstanding Woods continued complaints of pain. (Tr. 599). Although the MRI of the lumbar spine did show an extruded disc at L5-S1, this showing did not match Woods's symptoms. The note indicates a referral to physical therapy and continued use of a half dose of methadone "at bedtime to help him sleep." (Tr. 600).

On October 29, 2012, Woods had an office visit with Lionel J. Smith, M.D., who ultimately submitted a Medical Source Statement. (Tr. 625, 673). Woods presented to establish care for his back pain, as well as noting an irregular heartbeat. (Tr. 623). Woods hoped to get off of the methadone prescription, as it was "too strong." *Id.* Dr. Smith noted "no visible abnormalities and no tenderness on palpitation" of the back or spine. (Tr. 624). Regarding treatment, Dr. Smith switched Woods off of methadone and on to Lortab, as Woods wanted something milder than methadone and had not taken it for the preceding three weeks. (Tr. 624-23).

Just a few days later on November 1, 2012, Woods saw Dr. Smith again, this time for chest pains. Dr. Smith noted no musculoskeletal, neck, or lower extremity issues. (Tr. 621-22).

A little over three months later on February 12, 2013, Woods saw Dr. Smith for complaints of "pain and anxiety." (Tr. 670). Dr. Smith noted "joint pain and joint swelling." *Id.* Regarding Woods's knees, both appeared normal with a full

range of motion, but they were tender to palpitation. *Id.* Dr. Smith continued Woods on his medication for back pain, and added Nabumetone for Woods's knee pain. (Tr. 671).

A few weeks later on February 27, 2013, Woods had a follow-up visit with Dr. Smith, for which his treatment notes indicated that Woods was doing better, X-rays revealed no abnormalities of his knees, Woods declined physical therapy, and he chose to just watch for any worsening "for now." (Tr. 668).

A little over two months later on May 7, 2013, Woods had a follow-up visit concerning his cardiac symptoms. (Tr. 662). Dr. Smith noted Woods's symptom of back pain but made no notations regarding abnormalities or other issues with Woods's neck, musculoskeletal system, or lower extremities. *Id.*

Woods's next visit to Dr. Smith is nearly a year later, on April 7, 2014, for a follow-up visit. Dr. Smith again notes joint pain, although he only assessed Woods with right shoulder pain and a skin disorder (a wart on his heel). (Tr. 660). He also changed Woods's pain medication to "as needed," as opposed to daily. *Id.* Woods's next two visits, also in April of 2014, noted his continued complaints of knee pain, although both knees appeared normal and had a full range of movement, albeit with some tenderness. (Tr. 656, 665). Almost no mention of Woods's back pain is mentioned in these treatment notes. *Id.*

Finally, on June 27, 2014, shortly before Woods's hearing before the ALJ, he saw Dr. Smith for a follow-up visit on his back pain and medication refills. Dr. Smith noted Woods's symptom of back pain and "right flank pain." (Tr. 21). Dr. Smith scheduled Woods for a CT scan and follow-up.

B

On July 11, 2014, Dr. Smith submitted a Medical Source Statement of Ability to Do Work-Related Activities (Physical) for the Commissioner's consideration. (Tr. 675). Dr. Smith assessed the claimant as having quite significant physical

5

limitations. He indicated that Woods would be limited to standing or walking for less than two hours in an eight hour workday, sitting for less than two hours out of an eight hour workday, and would need the opportunity to shift at will from sitting to standing or walking, as well as walk around twice an hour for approximately five minutes each time. Dr. Smith also opined that Woods would have significant postural and manipulative limitations and would need to avoid even moderate exposure to a number of environmental conditions. Finally, he opined that Woods would, on average, miss more than four days per month due to the effects of his impairments and treatment. *Id.*

By way of narrative in support of these findings, madevia checkboxes, Dr. Smith provided this:

> **What medical findings support the limitations described above?**
>
> has had spinal fusion
> has had MRIs

(Tr. 675), this:

> **What medical findings support the limitations described above?**
>
> as above
> has fallen due to balance issues

(Tr. 676), this:

**What medical findings support the limitations described above?**

*as above*

(Tr. 676), and, finally, this:

**What medical findings support the limitations described above?**

*as above*

(Tr. 677).

Joseph J. Kozma, M.D., a consultative examiner, examined Woods on July 16, 2012, and prepared a report dated August 3, 2012. (Tr. 614). Dr. Kozma found that Woods would have no difficulty using his fingers for gross and fine manipulation. The notes of his physical exam of Woods reveal nothing out of the ordinary with the exception of decreased motion in the hips on both sides and mild tenderness of the upper lumbar spine. However, in his discussion, where Dr. Kozma is clearly recounting Woods's statement to him, he notes:

> He is able to walk a block and he is able to be on his feet for ten (10) minutes or so. He does have moderate to high degree of discomfort in his right knee. He has difficulty climbing stairs because of that. The pain level is 6 on the average. There is some radiation of discomfort from the low back into both hips.

(Tr. 618).

Richard Lee Smith, M.D., a state agency medical consultant, provided his opinion as well in a report from August of 2012. (Tr. 88). Dr. R. Smith limited Woods to occasionally lifting 20 pounds, frequently lifting 10 pounds, standing 6

hours out of an 8-hour workday, and sitting 6-hours out of an 8-hour workday. He also stated the following:

> Claimant has chronic back pain and chronic pain of the right knee. Gait is normal. Good hand grip and movements of fingers. Sensory exam is normal. Cardiac exam was unremarkable. Range of motion of hips is decreased on both sides. No swelling, tenderness, or crepitus of any joints. Mild tenderness of the upper lumbar spine. Clmt is SIP lumbar fusion (confirmed by MRI).

(Tr. 95). Regarding postural limitations, he found as follows:

> Does the individual have postural limitations?
> Yes
>
> Rate the individual's postural limitations:
>
> Climbing Ramps/stairs: Occasionally
>
> Climbing Ladders/ropes/scaffolds: Never
>
> Balancing: Unlimited
>
> Stooping (i.e., bending at the waist): Occasionally
>
> Kneeling: Occasionally
>
> Crouching (i.e., bending at the knees): Occasionally
>
> Crawling: Occasionally

*Id.* Dr. R. Smith accordingly concluded that Woods was not disabled, he being capable of performing light exertional work with some additional postural limitations as noted above. *Id.*

## C

At the hearing before the ALJ, Woods testified regarding his pain and limitations. (Tr. 48-79). Woods testified he saw Dr. Lionel Smith every other week

8

for medication and referrals to other specialists. He took Lortab for pain two to three times per day, from which he experienced drowsiness and dehydration. He still experienced pain, but the Lortab dulled it. He had osteoarthritis in his right shoulder and experienced stabbing pain from it. He was right handed, and it would hurt to reach overhead. He could reach at eye level. He could reach forward but not hold any weight.

After his shoulder surgery in 2008, he had trouble lifting more than ten pounds. He underwent physical therapy, but it only helped a little. Even though in June of 2009 he was released to full duty from his shoulder surgery, he did not go back to work because of a subsequent spinal surgery. He continued to experience pain in his back that radiated down to his thighs and feet; they felt asleep all the time. He felt if he used both hands he could probably lift ten pounds, but twenty pounds would be too much, and he could not lift ten pounds on a regular basis. He had trouble sitting for too long; it felt like his back was curling over after 15 to 20 minutes.

Woods further testified he had trouble standing for longer than two to eight minutes. He needed help with grooming his beard and mustache. He usually took a bath rather than having to stand in a shower. He thought he could walk a block, but he did not go to Wal-Mart or the grocery store. In addition to his trouble walking, he would become too anxious.

He had visitation with his two sons every other weekend. If his mother could not go pick them up, he would drive to go get them and bring them home to watch movies or play video games. He was by himself during the day, and he did not cook; he ate a sandwich or cereal. His mother helped out as well. He tried to be active around the house and do some dishes or straighten up. He worried about being able to function with his sons. He did not take them fishing or to a ball games. He just sat in the yard and watched them play across the street from

his house at an elementary schoolyard. He had fallen four times in the last year, at an increasing rate.

He also testified that when he had trouble sitting down, lying down took the pressure off, but standing did not help.  He would lay down two to five times a day. Depending on the pain, he would lay for 45 minutes to five hours. His knees had swelled three times so far that year, and they stayed swollen for a day or two. He had to elevate his legs. His pain also affected his sleep.  If he rolled over on his shoulder, it felt like someone was stabbing him. He would wake up once or twice a night. It would take an hour to go back to sleep.

A Vocational Expert (VE) also testified at the hearing and, although not testifying at the hearing, Woods's mother and wife presented third party function statements.

## D

The ALJ considered and addressed all this evidence in her decision rendered on August 27, 2014. (Tr. 30-41).  First, she found Woods had the following severe combination of impairments: degenerative disc disease, heart palpitations and cardiomegaly; multi-level lumbar vertebral facture, status post fusion secondary to a motor vehicle accident; and dysfunction of the bilateral knees.  She also found that none of these impairments met or medically equaled a Listing.

The ALJ then concluded that Woods had the following RFC:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with some additional limitations. The claimant can occasionally lift up to twenty pounds, and frequently lift ten pounds. He can stand and/or walk for six hours out of an eight hour workday, and sit for two hours out of an eight hour workday. The claimant can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. He can frequently balance. The claimant should not perform work on ladders, ropes, or scaffolds. He can perform simple work consisting

> of one to two step instructions. The claimant would do best if allowed to work independently, with only occasional contact with the public, and should not be asked to perform fast paced work. He can perform goal oriented work and is otherwise able to sustain and maintain a schedule.

(Tr. 34).

In formulating this RFC, the ALJ discussed the various treatment notes discussed, *supra*. Regarding Lionel Smith's Medical Source Statement, she gave his opinion "less weight." (Tr. 38). She noted that his opinions were presented in "check-box" form with only minimal supporting narrative. In addition to being inconsistent with the medical evidence as a whole, she found that the opinions were also inconsistent with Dr. Smith's own treatment notes such that his own objective records did not reflect the level of dysfunction indicated by his opinion. *Id.*

Regarding the opinion of consultative examiner, Dr. Kozma, the ALJ gave his opinion "reasonable weight." *Id.* She concluded that his opinion was well supported by the record, although his statement that Woods could only be on his feet for "10 minutes or so" appeared to be based solely upon Woods's subjective complaints. Likewise, the ALJ also gave "reasonable weight" to state agency medical consultant Dr. Richard Smith's opinion. *Id.* She concluded that his opinion was well supported by a narrative explanation and was consistent with the medical opinion as a whole. Although the opinion was issued in 2012, she concluded that the subsequent evidence which came into the record did not contradict his opinions. Finally, the ALJ also gave reasonable weight to the opinion of state agency medical consultant, Sandra Bilinsky, M.D., who also concluded that Woods was able to perform work at the light exertional level with some additional limitations for essentially the same reasons as Dr. R. Smith. (Tr. 38).

The ALJ also concluded that Woods's statements regarding the intensity, persistence, and limiting effects of his impairments were only partially credible. In so finding, she noted a number of factors, including the cautious approach to his treatment after the accident and his release back to work with restrictions in July 2008 with only reports of intermittent back pain. After his back surgery in 2009, he was released for full work and sought no treatment until October of 2010, when objective medical tests revealed only minor musculoskeletal findings. Likewise, regarding Woods knee and cardiac issues, the ALJ noted that his treatment records indicated mostly unremarkable findings and routine treatment. Finally, the ALJ cited some of Woods's activities of daily living as evidence that the statements with regard to the intensity, persistence, and limiting effects of his impairments were only partially credible. Because the statements of Woods's mother and wife echoed his own, the ALJ found those statements only partially credible for the same reasons.

In light of the RFC and the testimony of the VE regarding jobs available for someone with the limitations contained therein, the ALJ found Woods was not disabled.

In this Court, the Plaintiff argues that the ALJ erred by 1) failing to give substantial weight to the opinion of treating physician Dr. Lionel Smith; and 2) making a patently erroneous credibility determination regarding Woods's claims regarding the intensity, persistence, and limiting effects of his impairments. The Commissioner responds that the ALJ's decision is supported by substantial evidence.

### III
### A

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566 (1986). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th

Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, the Plaintiff claims error on the ALJ's part at step four when formulating Woods's RFC.

B

Though an ALJ must give controlling weight to the medical opinion of a treating physician, the ALJ must do so only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), citing *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2). An ALJ must provide "good reasons" for discounting such opinions. *Cambell v Astrue,* 627 F3d 299, 306 (7th Cir 2010). Should an ALJ provide such "good reasons" for discounting a treating physician's opinion, she must then decide what weight to give that opinion. *Id.* at 308. If the ALJ does not give a treating physician's opinion controlling weight, the Social Security regulations require the ALJ to consider:  1) the length, nature, and extent of the treatment relationship; 2) the frequency of examination; 3) the physician's specialty; 4) the types of tests performed; 5) and the consistency and supportability of the physician's opinion.  20 CFR § 404.1527; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Although the Plaintiff argues that the ALJ erred in refusing to give Dr. Lionel Smith's Medical Source Statement controlling weight, the record demonstrates otherwise.  First, as the ALJ noted, Dr. Smith marked a number of boxes indicating the severity of Woods's impairments, but he provided no real explanation for why he believed Woods to be so impaired. As the excerpts from Dr. Smith's statement quoted, *infra*, show, the sum total of his reasons were: "has had spinal fusions;" "has had MRIs;" "has fallen due to balance issues;" and "as above." (Tr. 676-77). None of these statements provide any insight into why Dr. Smith believed Woods to be as impaired as he checked in the boxes.

Perhaps Dr. Smith's lack of explanation could be overlooked if his own treatment notes supported the level of impairment he found but, again as the ALJ

15

noted, those notes do not support his findings. For example, On October 29, 2012, after Woods applied for disability benefits, Woods had his first office visit with Dr. Smith. Dr. Smith noted "no visible abnormalities and no tenderness on palpitation" of the back or spine at the time, and he switched Woods off of methadone and on to Lortab, a milder pain medication. A few days later at another visit with Dr. Smith, this time for chest pains, Dr. Smith noted no musculoskeletal, neck, or lower extremity issues. A little over three months later, Woods saw Dr. Smith for complaints of "pain and anxiety." Although Dr. Smith noted "joint pain and joint swelling," he also noted that both of Woods's knees appeared normal with a full range of motion and continued Woods on his medication for back pain while adding Nabumetone for the knee pain. A few weeks later at a follow-up visit with Dr. Smith, he indicated that Woods was doing better, X-rays revealed no abnormalities of his knees, Woods declined physical therapy, and he chose to just watch for any worsening. Two months later at another follow-up visit concerning Woods's cardiac symptoms, Dr. Smith made no notations regarding abnormalities or other issues with Woods's neck, musculoskeletal system, or lower extremities. Nearly a year passed before Woods's next visit with Dr. Smith, for another follow-up visit on April 7, 2014. Dr. Smith noted joint pain, although he only assessed Woods with right shoulder pain and a skin disorder (a wart on his heel). He also changed Woods's pain medication to "as needed," as opposed to daily. Woods's next two visits, also in April of 2014, noted his continued complaints of knee pain, although both knees appeared normal and had a full range of movement, albeit with some tenderness. Almost no mention of Woods's back pain is made in these treatment notes.

    Nothing in these treatment notes provide any support for Dr. Smith's opinions regarding the level of impairment he found in his Medical Source Statement. Without providing any explanation on the statement itself, and with

Dr. Smith's own treatment notes providing no clues as to how Dr. Smith arrived at his opinions, the ALJ correctly concluded that Dr. Smith's opinion should not be given controlling weight.

Looking beyond Dr. Smith's Medical Source Statement and his treatment notes, the other medical evidence supports the ALJ's conclusion that Dr. Smith's opinions were not entitled to controlling weight. Undoubtedly, Woods was severely injuring by his car accident. However, after his surgery in 2009, Woods showed a stable fusion of the affected area of his spine, reported feeling much better regarding his back pain, and was released to full work duty without restriction in June of 2009. Woods nevertheless did not work after being released to do so without restriction and, for the next 22 months, had only one doctor's visit for the purpose of establishing care and "quitting smoking." (Tr. 604). There is simply nothing to support Dr. Smith's conclusions regarding Woods's level of impairment in these records.

Rather, all the medical evidence supports the medical opinions to which the ALJ gave "reasonable weight." Indeed, the ALJ reasonably credited the contrary opinions of Drs. Richard Smith, Dr. Bilinsky, and Dr.Kozma, the physician who performed the consultative physical examination. An opinion may be entitled to greater weight if supported by an explanation and consistent with the record as a whole. 20 C.F.R. § 404.1527(c). Here, the ALJ found that the state agency consultants provided a better explanation of their findings than did Dr. Lionel Smith. The regulations also explain that state agency medical consultants are experts in disability evaluation. 20 C.F.R. § 404.1527(e)(2)(i). In weighing their opinions consistent with the regulations, the ALJ gave credence to their qualifications and expertise. Finally, Dr. Kozma's opinion was reasonably credited to the extent it was supported by his examination report and somewhat discounted where it relied on Woods's self-reports rather than medical evidence.

*See* 20 C.F.R. § 404.1527(c). Thus, the ALJ reasonably concluded that these opinions were more consistent with the record than was Dr. Lionel Smith's opinion.

In sum, the ALJ did not err in declining to give Dr. L. Smith's opinion controlling weight where he failed to support his opinions in his Medical Source Statement, his treatment notes did not support his opinions, the other objective medical evidence did not support his opinions, and the other medical opinions credited by the ALJ were more consistent with the evidence in the case taken as a whole.

## C

Regarding the Plaintiff's attack on the ALJ's credibility determination, this argument fails as well. An ALJ must consider all of the individual's symptoms with the entire case record, including medical and nonmedical sources. SSR 16-3p. A claimant must provide credible testimony and objective evidence to qualify for disability insurance benefits for allegations of disabling pain. *Moothart v Bowen*, 934 F.2d 114, 117 (7th Cir 1991). If a claimant's statements "about the intensity, persistence, and limiting effects of symptoms are inconsistent" with the other evidence, the ALJ "will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities . . . ." *Id*. "Although an ALJ's credibility determination is usually entitled to deference, 'when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision.'" *Clifford v Apfel*, 227 F3d 863, 872 (7th Cir 2000), quoting *Herron v. Shalala*, 19 F3d 329, 335 (7th Cir 1994). In other words, the ALJ's credibility determination may only be reversed if it is "patently wrong." *Ingram v. Colvin*, 2014 WL 3704816, *6 (C.D. Ill. July 25, 2014), citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir 2010).

As already discussed at length, *supra*, the totality of the medical evidence and opinions in the records simply do not support the level of pain or impairment claimed by Woods. The ALJ clearly set forth her reasons in only partially crediting Woods's claims. These reasons included the cautious approach to Woods's treatment after the accident and his release back to work with restrictions in July 2008 with only reports of intermittent back pain. After his back surgery in 2009, he was released for full work and sought no treatment until October of 2010, when objective medical tests revealed only minor musculoskeletal findings. Likewise, regarding Woods's knee and cardiac issues, the ALJ noted that his treatment records indicated mostly unremarkable findings and routine treatment. Finally, the ALJ cited some of Woods's activities of daily living as evidence that his statements regarding the intensity, persistence, and limiting effects of his impairments were only partially credible. To fully credit Woods's claims of pain and impairment in this case would require the ALJ to virtually ignore the objective medical records in this case, something, of course, she cannot do. Rather, her credibility determination was fully supported by the medical evidence in the record, and she did not err in refusing to take all of Woods's claims at face value.

## IV

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment is DENIED, the Defendant's Motion for Summary Affirmance is GRANTED. The Court AFFIRMS the ALJ's Decision. This matter is now terminated.

*It is so ordered.*

Entered on October 25, 2016

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE